TRIANGLE ELECTRIC SUPPLY CO.,
Inc., Plaintiff,

v.

MOJAVE ELECTRIC CO. et al.,
Defendants.

KOPPERS COMPANY, Inc., Plaintiff,

v.

CONTINENTAL CASUALTY CO., Inc. et
al., Defendants and Third-Party
Plaintiffs,

v.

NATIONAL UNION FIRE INSURANCE
CO. OF PITTSBURGH, PA., Third-
Party Defendant.

Nos. 12904, 13232.

United States District Court
W. D. Missouri, W. D.

Oct. 5, 1964.

Lathrop, Righter, Gordon & Parker, Kansas City, Mo., for Triangle Electric Supply Co., Inc.

Swanson, Midgley, Jones, Blackmar & Eager, Kansas City, Mo., for Koppers Co., Inc.

Rafter, Biersmith Miller & Walsh, Kansas City, Mo., for D & L Const. Co. and Associates.

Douglas Stripp, Clayton R. Smalley, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.

JOHN W. OLIVER, District Judge.

The cross-claim of defendant D & L Construction Company and Associates, the prime contractor on the Fort Leonard Wood Capehart job, against National Union Fire Insurance Company, the surety on the payment and performance bonds of the defaulted subcontractor, Mojave Electric Company, has been submitted for final decision pursuant to an amended final pre-trial order, the testimony adduced at the hearing, and the parties' stipulation designating the record. That stipulation designates and identifies the various exhibits, pleadings, discovery items, earlier pre-trial orders, depositions, and the transcript of evidence adduced at the hearing held in our Southern Division at Springfield.[1]

Earlier in this case, D & L filed a motion for summary judgment on its cross-claim. Although a great mass of documentary evidence was not questioned by National Union, we refused to rule this case on that motion because of National Union's representation that many of the facts were in dispute.

Subsequent proceedings, however, including the hearing at which two witnesses testified, revealed that the areas of factual dispute are indeed narrow and that the controversies between the parties revolve around questions of law and the inferences that should or should not be drawn from what are, for the most part, the undisputed facts.

1. This case has since been transferred to our Western Division at Kansas City. The former Southern Division number is therefore carried in parenthesis. Our action sustaining plaintiff's motion for summary judgment on Count I of this particular Capehart case is reported as Triangle Electric Supply Co. v. Mojave Electric Co., W.D.Mo.1963, 217 F.Supp.

## FINDINGS OF FACT

In order to place the legal questions in perspective, we make the following findings of fact:[2]

1. The original plaintiff, Triangle Electric Supply Company, Inc., is a Texas corporation having its principal place of business in such state. Defendant National Union Fire Insurance Company of Pittsburgh, Penn. (herein sometimes referred to as "National Union"), is a Pennsylvania corporation with its principal place of business in that state. The defendant-crossclaimant D & L Construction Co. and Associates (herein sometimes referred to as simply D & L) is a joint venture composed of D & L Construction Company, a California corporation, and several individuals also residents of California. There is thus complete diversity in the citizenship of the parties. The matter in controversy exceeds $10,000 exclusive of interest and costs.

2. On August 18, 1959, D & L entered into a contract (the "Prime Contract") whereby it undertook, under authority of the legislation commonly referred to as the "Capehart Act" (42 U.S.C. § 1594 ff.), the construction of 700 residential housing units at Fort Leonard Wood, Missouri, for a lump sum price of approximately eleven million dollars.

3. The electrical work required by the prime contract was thereafter subcontracted to Mojave Electric Company by separate written subcontracts, one requiring the performance of all the exterior electrical work for a lump sum price of $200,000.00; a second, the interior electrical work, for a price of $330,000.00.

913, affirmed sub nom. D & L Construction Co. v. Triangle Electric Supply Co., 8 Cir. 1964, 332 F.2d 1009.

2. The facts found in the specifically numbered paragraphs to follow immediately are adopted in substance from those proposed by D & L. The modifications in paragraphs 1 through 9 are minor.

4. As required by such subcontracts, Mojave, as principal, and National Union, as surety, executed and delivered to D & L the following four bonds:

(a) A "payment bond" relating to the exterior electrical work in a face amount of $200,000.00;

(b) A "payment bond" relating to the interior electrical work in the face amount of $330,000.00;

(c) A "performance bond" relating to the exterior electrical work in the face amount of $200,000.00;

(d) A "performance bond" relating to the interior electrical work in the amount of $330,000.00.

5. The two payment bonds were each conditioned solely upon the prompt payment by Mojave of all labor and material used in the prosecution of the work of the respective subcontracts.

6. Such condition of each of these bonds was at least prior to April 1, 1960, breached by the failure of Mojave to promptly pay for material furnished and labor supplied or performed in the prosecution of the work of the respective subcontracts.

7. The two performance bonds were each conditioned solely upon the faithful performance by Mojave of all of the terms and conditions of the respective subcontracts.

8. By March 28, 1960, Mojave had done nothing toward the performance of either of the subcontracts, other than order, receive and store materials on the job site.

9. On March 28, 1960, D & L notified Mojave and National Union that Mojave was "not maintaining satisfactory progress" as required by the provisions of paragraph four of the subcontracts and that unless satisfactory progress was resumed by March 31, D & L would proceed to avail itself of the remedies provided by said paragraph; i. e., that it would relet the work of the subcontracts and charge the costs of completion to Mojave and National Union. On April 4, 1960, D & L requested National to proceed with the defaulted work in accordance with Paragraph 4(a); but National elected not so to do.

D & L's proposed findings in paragraphs 10 to 22, respectively, relate to the extent of damages. D & L requests that we find that D & L was damaged $78,219.71, as a result of the breach of the exterior payment bond, and $28,479.-41, as a result of the breach of the interior payment bond. In regard to the exterior performance bond, D & L requested a finding that more than the $200,000.00 face amount was spent to complete Mojave's defaulted subcontract, and a finding for reasonable attorney's fees in the amount of $10,000.00, together with interest.

In regard to the interior performance bond, D & L requested a finding that $318,402.00 was spent to complete the defaulted Mojave subcontract, and that interest and a reasonable attorney's fee of $15,000.00 should also be allowed.

The various pre-trial stipulations and pre-trial orders have dealt with the actual dollars involved in particular categories of damage. The proposed findings of the parties in regard to particular amounts show a large area of agreement as to particular amounts but they also show some disagreement in regard to other particular amounts.

National Union has noted of record that its requested finding of fact F–39 was limited "to the amounts potentially involved in various items of damages sought by D & L in the event the Court should hold in its favor" and that "no findings were requested as to the total amount of final judgment. * * * because of the great number of unresolved legal issues bearing on the recovery and amount of various categories of damages."

National Union also suggested in that letter, and we think it a good suggestion, that we should "allow the parties to consult with each other as to the amount of the judgment, if any, after the Court has made its decision on the various issues raised by the requested Findings of Fact and Conclusions of Law."

In our order at the end of this Memorandum Opinion we shall direct further proceedings consistent with that thought. We shall not, therefore, either accept or reject any of the specific requests of the parties that include particular dollar amounts as included, for example, in paragraphs 10 through 22, inclusive, of D & L's requested findings.

In regard to the affirmative defenses asserted by National Union we make the following findings of facts:[3]

23.[4] The execution of the instant bonds by National Union was effected through its New Orleans agents, the firm of Emery and Kaufman, Ltd. Sometime prior to December, 1958, that agency was contacted by one Marshall Brown concerning the possibility of becoming, on behalf of National Union, the bonding agency for the construction activities of Mojave Electric Company.

24. Brown was instructed to obtain the customary financial information. After making the usual investigation, such as obtaining audited financial reports and making independent verifications with architects, prime contractors, etc., L. L. McKinney, who was handling the matter on behalf of the Kaufman agency, reviewed the resulting financial information with the auditor, Heenan, and on the basis of that information and investigation recommended the establishment of a line of bonding credit by National Union for Mojave.

25. Under a "line of credit" an agent is authorized to execute on behalf of the company any number of bonds to the designated limit, consulting with his home office only when there is a departure from the established line, a bonding procedure distinguished from the alternate practice where the agent must obtain from his principal specific authority to bond a particular project.

26. Mojave's line of credit with the Kaufman agency was established at $1,-000,000.00 in December of 1958. In October, 1959, and after obtaining additional information and documentation, including for added protection an indemnity agreement signed by Mojave's principal officer and his wife on April 23, 1959, showing a personal worth exceeding $250,000.00, the authorized line of credit was increased to $2,000,000.00.

27. Although as noted the instant subcontracts were executed on August 18, 1959, execution of the bonds therefor was for unexplained reasons delayed until December 18, 1959, when Heenan sent the following "Speedmemo" to McKinney: "Please execute bonds on attached contracts: 330,000.00 and 200,-000.00—Rush! Job progress report now in progress."

28. Although not required, since it was a line of credit client and because they already had a general indemnity agreement, the signature of one Troupe, an employee in Mojave's New Orleans office was obtained on partially filled in application forms. Without further investigation and with no particular investigation of the Fort Leonard Wood Capehart construction project, two payment bonds and two performance bonds were signed by Kaufman as attorney in fact for National Union and countersigned by McKinney as he was authorized to do under company approved lines of credit. Presumably, in accordance with practice, execution reports were then sent to the home office. The bonds themselves were mailed to Kansas City,

3. We again follow the paragraph numbers contained in D & L's requested findings of fact in regard to these further particular findings of fact. It is to be understood, of course, that still additional findings are made elsewhere in this memorandum opinion and that they supplement those we now find.

4. National Union contends that the findings made in this paragraph and paragraphs 24, 25, 26, and 28 to follow, all relating to National Union's investigation of Mojave's financial resources, the establishment of the line of credit, and the like, are immaterial and irrelevant. As we will note later, we believe the extent of National Union's general and particular investigation of the particular job it was bonding is most material in regard to the affirmative defenses it has pleaded.

Missouri, for countersignature by National's Missouri agent, the Ridge-Spellman Insurance Agency. They were finally delivered by Mojave to the attorney for D & L on January 13, 1960.

29. Under the financing arrangements peculiar to a Capehart project, the prime contractor is required to form one or more Delaware corporations which serve as a conduit for funds from the private lender to the prime contractor during the construction period. In accordance with the terms of the building loan agreement advances are made to the prime contractor on a monthly basis. According to the categories established in the "trade payment breakdown", periodic progress is measured as a percentage of the lump sum contract price, rather than the usual quantities of completed work, and the monthly payment is the single dollar amount equivalent to that percentage. The monthly percentages are established by informal negotiation between the prime contractor and the government inspectors, here the designated representative of the Corps of Engineers, and are measured as the total of physical completion plus the agreed value of acceptable materials delivered to and suitably stored on the job site but not incorporated into the buildings composing the project. Since the materials have thus been paid for in the inventory stage, their value is later deducted from the sums which would otherwise be due as physical completion in later progress payments.[5]

30. In subcontracts where material represents a major portion of the total subcontract price, purchases of material must as a practical matter be financed by periodic payments for material inventories as well as physical completion. The materials are ordered from the supplier in total quantities, delivered to the job site and stored in a designated area adjacent to the construction site (an area which has a short term lease on it which is also given as security for the mortgage in addition to the construction site). Once the materials are stored on this area, the storage area, the subcontractor supplying the material furnishes the prime contractor his estimate of the value of the materials so stored. The prime contractor informally turns this over to the military inspector who makes a physical examination of the inventory and advises the prime contractor of the value which he will approve as to each subcontractor. The prime contractor, in turn, advises the subcontractor of the amount of money which will be approved as an inventory allowance. The subcontractor then submits a formal requisition or billing in the approved amount which the prime contractor includes with those of other subcontractors in its monthly application to the lender for funds. When the prime contractor receives the requested funds from the lender through the Delaware corporation, he in turn pays the subcontractors the portion thereof representing the requisition of the particular subcontractor.

31. Each of the Mojave subcontracts was executed on a printed form of subcontracting agreement which D & L's counsel adopted from that used on an earlier Capehart project (where Mojave had also been the electrical subcontractor and National Union its surety) and used on this and several other Capehart projects involving over 200 subcontractors, all paid in the above manner.

---

5. National Union objects to the relevancy of the economic facts concerning the established Capehart payment procedures. Our determination that those procedures, required and made necessary as they are by statute, must be read into the bonds, along with the prime contract and that statute, (as we shall develop in some detail later) affords one base for our adverse ruling in regard to National Union's objections to this paragraph and to similar objections made in regard to paragraphs 29, 30, 31, 33, 35, 38, 41, and 55 to follow.

We also add that we believe that additional support for this and the other findings mentioned will be found in the contract documents and other documentary evidence stipulated in this case, as well as in the deposition testimony to which our attention was directed by the respective parties.

32. Each form of subcontract provided as to the manner in which progress payments would be made to a subcontractor:

"3. For the strict (but not substantial) performance of all its obligations hereunder, Contractor shall pay to the Subcontractor the following amounts and in the following manner: The total amount of $ (lump sum price inserted) payable at the rate of 90% of all material and labor in place as shown on the following schedule:

(payment to be based upon actual progress)

and payment will be made monthly as Contractor receives funds from the lender for same, and the balance of 10% on the completion of the prime contract for each mortgage area and when the contractor has received final payment from the lender for the work performed by Subcontractor.

\* \* \* \* \* \*

"9. Subcontractor shall submit to the Contractor an application for each payment, and releases, receipts or other vouchers evidencing payment for materials and labor together with such additional evidence bearing on the right to the payment claimed as Contractor may direct."

33. The above clauses were included in subcontracts on the other Capehart projects where this same form was used, including those at White Sands, New

Mexico, and Yuma, Arizona, where Mojave was also the electrical subcontractor and National Union was its surety.[6]

34. As the officer of National Union testified, "[On-site material] is a normal condition or item that a contractor would get paid for, on-site material, materials which are stored on the job site, and presumably for which he is being billed or has paid for. This happens in every contract, whether it is Capehart or anything."

35. Paragraph 9 of the subcontract, using the discretionary word "may", was to permit the prime contractor to require of the subcontractor such receipts in the event they were required of the prime by the government under Article IX of the Housing Contract; otherwise, there was no other evidence bearing on the right to a payment other than copies of invoices, the formal requisition for funds, and the approval of the inspector, unless the prime contractor had been alerted by claims of unpaid materialmen.

36. The date and amount of all payments by D & L to Mojave and the contract with respect to which paid were as follows:

| Date | Contract | Amount |
|------|----------|--------|
| 11/16/59 | Exterior | $50,000.00 |
| 12/29/59 | Exterior | 25,248.00 |
| 12/29/59 | Interior | 68,373.00 |

37. Each of these payments was made pursuant to signed application of Mojave on the standard form of "Subcontractor Requisition for Funds," accompanied by

---

6. Our modification of D & L's suggested findings reflects our view that our ultimate determination of the meaning of the clauses of the subcontracts must be ascertained and based on more factual data than simply the statement of the draftsman that he intended, by his choice of language, "to provide by the above clauses for the payment of material inventory as well as physical progress," as the D & L finding is suggested.

We determine elsewhere that under all the facts and the applicable law which requires the subcontract and its bond to be read in the light of the prime contract and the statute, that all the parties must be held to have contemplated that material inventory would be paid for when and if approved by the Corps of Engineers as a part and parcel of the usual Capehart financing procedures and that the very purpose of a subcontractor's bond was to insure the prime contractor that it would be protected against the subcontractor's default in regard to material purchases. Those and other similar determinations require that the clauses be construed in D & L's favor. This footnote is to make clear that we consider the expressed intentions of the draftsman as only one circumstance that must be taken into account in our consideration of this case.

a formal progress billing and a detailed inventory of materials represented by Mojave as being suitably stored on the job site. No "releases, receipts or other vouchers" evidencing payment by Mojave to the supplier of the materials were presented by Mojave or requested of it by D & L.

38. In order to ascertain that the materials listed in the inventories and for which payment was requested in the above requisitions were acceptable materials and were suitably stored on site so that payment therefor would be forthcoming from the lender, D & L obtained the customary Project Inspection Report from which the responsible official of the Corps of Engineers attested that all of the materials for which payment was being made were stored on the site in an acceptable manner and that the amounts for which payments were made represented acceptable work and materials.

39. By December 29, 1959, D & L had received from the lender the sum of $75,248.00 certified by the Resident Engineer and approved by the Contracting Officer as the value of uninstalled acceptable materials for use in the exterior electrical subcontract stored in an acceptable manner on the mortgaged property but not incorporated into the work.

40. By December 29, 1959, D & L had received from the lender the sum of $68,373.00, certified by the Resident Engineer and approved by the Contracting Officer, as the value of uninstalled acceptable materials for the electrical work, interior, stored in an acceptable manner on the mortgaged property but not incorporated into the work.

41. The method used by D & L in making the periodic progress payments to its subcontractors on this and other Capehart projects accorded with the intent and understanding of all parties and was consistent with recognized custom and practice. D & L, Mojave and National Union, all recognized that Mojave was, on December 29, 1959, entitled to these payments of $68,373.00 and $75,248.00, subject only to its duty to furnish the bonds called for in the subcontracts.

42. The making of the above payments did not materially alter or affect the nature or extent of the obligations originally assumed by Mojave under the aforesaid subcontracts nor those assumed by National in executing the instant bonds.

43. Each of such payments was made prior to the delivery to the obligee of the bonds in suit, but not before National Union was obligated on the respective bonds.

44. National Union is in the business of writing, for compensation in the form of premiums, payment and performance bonds on construction projects and was indemnified by its principal to the extent of the indemnification agreement of record.

45. National Union's rights might, perhaps, have been prejudiced if the payments to Mojave were represented as physical progress and that progress had not actually been accomplished; or, if for material inventory, the materials had not actually been on site; or the proceeds of the payments had knowingly been applied to jobs other than this, or other than those bonded by National Union.

46. No factual basis for prejudice to National Union has been shown in this case. No physical progress was falsely represented. Mojave's requisitions and inventories, certified by the inspectors, justified D & L in concluding that the material inventories were "on-site." National Union made no investigation as to the subsequent use of these funds by Mojave. National Union adduced no evidence indicating the application of these payments to any project or any use other than the prosecution of the work at Fort Leonard Wood. No evidence of knowledge on the part of any of the parties to such was adduced by anyone.

47. On December 31, 1959, National Union's total exposure on projects on which it had bonded Mojave was in excess of $1,000,000.00.

48. Mojave requested the instant payments in order to finance and pay for the purchase of material and its payroll

and overhead costs on the Fort Leonard Wood project.

49. All payments for material inventory are deducted from amounts which would otherwise be later due and if not paid upon initial request are reinventoried and re-requested in subsequent monthly invoices.

50. National Union was not prejudiced by the making of any of the above payments to Mojave.

51. National Union did not adduce any evidence as to the fact, nature, or extent of any prejudice resulting from any one of the above payments.

52. All such payments were made prior to the delivery of the bonds to the obligee, D & L, on January 13, 1960.

53. Prior to the making of the payments of December 29, 1959, National Union's agent, Kaufman, was informed by Mojave as to the amounts in which the payments were being requested and would be made; of the circumstances out of which the demand for payment arose; and, specifically, that they were for material inventories. Kaufman demanded that the payments be made as due under the subcontracts. When D & L refused to make the payments unless the execution of the bonds be confirmed in writing by National Union, Kaufman, for the specific purpose of inducing D & L to make the payments, sent D & L a telegram confirming that the bonds had been executed by him.

54. National Union, under all the facts, must be held to have consented to the making of the payments of December 29, 1959.

55. National Union knew at the time these bonds were executed from the practice and its experience on this and previous Capehart projects that a subcontractor's periodic progress payments would include payment for material inventoried on-site but not actually incorporated into the work.

56. Neither of National Union's agents, Kaufman or McKinney, were acting upon any misrepresentation of fact either when the $2,000,000.00 line of credit was established in October of 1959, or when these particular bonds were executed by them on December 23, 1959. No misrepresentations were contained in the material submitted by Mojave upon which the line of credit was established and the bonds written. No other representations were made by Mojave.

57. No information was ever obtained from, or representations made by, any representative of the obligee, D & L, particularly not prior to December 23, 1959. Mr. Kaufman indeed denied that there was ever an occasion upon which any representative of D & L could have made a representation or disclosure of any material fact.

58. National Union did not rely upon any information furnished by D & L in establishing the line of credit or in executing the instant bonds but relied solely upon its usual, independent investigation of Mojave's affairs and the information furnished by Mojave in the course thereof; nor was there any prior occasion upon which D & L could have made disclosure of any material facts.

59. By December 29, 1959, the bonds in question had already been executed by National Union's agents.

We can not accept the language of the suggested findings of either party in regard to exposure of National Union on the four bonds mentioned in the finding made in paragraph 4 above, although, in result, we are in agreement with National Union's conclusion.

On the face of the four bonds, and by adding the amounts there set forth, it would seem that National Union has an exposure of twice the amount of the subcontracts bonded. There is no dispute, however, but that the bond applications called for only two, rather than four, bonds, totaling $530,000.00; that only two bonds of that amount were referred to in the Speedmemo, the telegram, and the letter of transmittal (although they were referred to as "performance bonds" in that letter); that premiums were paid on the basis of a $530,000.00 exposure rather than a $1,060,000.00 exposure;

and that D & L's counsel at least once in an earlier stage of this proceeding referred to the total coverage of $530,000.00, rather than the apparent face amount of $1,060,000.00 (page 66 of McKinney deposition).

Our acceptance of what might on its face appear to be an incredible story that an established surety company admittedly executed bonds totaling $1,060,000.00 when it actually intended to be bound only to the extent of $530,000.00 is justified by the revelations in this record as to how National Union elected to obligate itself in connection with this particular Capehart housing project and how surety companies generally operated in regard to Capehart bonds.

By the time Mojave had defaulted and D & L was trying to get a new take-over contractor who could obtain a bond, it was apparent that "owing to developments in the industry of building houses for the Government, it had become almost impossible to bond the subcontractors" (Fitzpatrick deposition, p. 30).

The hearings before the Subcommittee on Military Construction of the Senate Armed Services Committee on September 1, 1960, (86th Cong. 2nd Sess.) in connection with Work Stoppages on Capehart Housing Projects, was centered on projects on which Hal B. Hayes was the prime contractor. Senator Capehart's letter to Commissioner Zimmerman of June 20, 1960 (page 51 of the Hearings), states that he was reminded that the difficulties presented by the Hal B. Hayes projects "closely parallel a situation called to my attention last year." [7]

More pertinent to the facts of this case is the testimony of the individual who was probably most responsible for National Union's writing the bonds. He testified that a Capehart project "was a rough case to write" (page 4 of McKinney deposition); that at the time the bonds were executed he had been familiar with the Capehart program only "in a limited way" and that "in fact, even today my knowledge is somewhat limited as to the full characteristics of a Capehart project" (page 5 of McKinney deposition).

Mr. McKinney did, however, know that the three companies his firm represented, Continental, Seaboard, and National Union, had indicated to him that "the Capehart projects were not the best type of business * * * in the surety mind it was not the type of business to handle" (pages 5-6 of McKinney deposition).[8]

Mr. McKinney testified that he could not testify definitively concerning the reasons why Capehart projects were difficult to finance because "at that time my knowledge was so limited [that] if you were to question me as to how the financing is set up in a Capehart project, I couldn't answer you, because I don't know. I have never been involved with it enough to really know" (page 7 of McKinney deposition).

Mr. McKinney did, however, state to National Union in his recommendation that Mojave's line of bond credit be increased to $2,000,000, that "the problem of collecting from 'Uncle Sam' is tough, especially on negotiated work done by Mojave" (page 3 of McKinney Exh. 6).

---

7. We recognize, of course, that those hearings are only within our judicial notice. We cite those hearings in this jury-waived case solely for background purposes and to illustrate that what happened on the Fort Leonard Wood project, though highly unusual from a business practice viewpoint, was not factually unique so far as Capehart projects went. The ultimate litigation in connection with one of the Hal B. Hayes Capehart projects discussed in the hearings is reported as Continental Casualty Company v. United States, 5th Cir. 1962, 308 F.2d 846. That case dealt in part with

the "fourth tier" supplier defenses raised by the surety of a prime contractor mentioned in Senator Capehart's letter and with which we also dealt in our last memorandum opinion in the Fine v. Travelers Indemnity Co. consolidated cases W.D.Mo.1964, 233 F.Supp. 672, Nos. 1852, 1877, 1901, 1937, 1945 and 1954, decided September 8, 1964, but not yet reported.

8. All three companies, incidentally, are present parties litigant in various of the Fort Leonard Wood Capehart cases that pend in this Court.

The Edwards Air Force Base Capehart job was identified in that recommendation as one of the jobs that "the U. S. Government has required that Mojave be subcontractor." [9]

Mr. Kaufman, the head of the firm representing National Union, was also only generally familiar with the financing of a Capehart project (page 96 of Kaufman deposition). His particular familiarity with the status of the particular subcontracts here involved (which had been executed on August 18, 1959) at the time he telegraphed D & L that the bonds had been executed and were in force is revealed by the following testimony:

"Q. Let me ask you, Mr. Kaufman, if prior to sending the telegram, you made any investigation into the status of the work, if any, done by Mojave at Fort Leonard Wood, Missouri?

"A. I did not.

"Q. Was any such investigation made under your direction or control?

"A. There was not.

"Q. And it is your testimony that you sent such a telegram in reference to such bonds without any inquiry as to the status of the work; is that correct?

"A. That is correct."

Mr. Enders, a bond underwriter and an officer of National Union, testified at the hearing. He testified that he believed his experience with Capehart projects had been confined to "one or two Capehart projects other than this one" (Tr. 54). He never talked to Mojave or D & L concerning the bonds here involved (Tr. 51) and knew nothing about the payments (Tr. 53–54) before approving the execution of the bonds.

In regard to how four rather than two bonds were issued, Mr. Enders testified on direct examination as follows:

"Q. * * * can you tell we why four bonds, two separate bonds on each subcontract, were issued instead of only one on each subcontract? * * *

"A. I might only say this. The contract itself called for one bond, covering performance and payment in an amount equal to a hundred percent of the contract price. * * *

Now, in this particular instance here, and at the time that these bonds were required, to the best of my knowledge, National Union did not have one document in print that covered both performance and payment bonds. Therefore, we did what we considered at the time to be the most expedient thing, and naturally, as in all of these instances, they want the bond immediately, or sooner. So we executed a performance and payment bond, separate performance and separate payment bond, each in an amount equal to the contract price." (Tr. 37–38)

On cross-examination, he testified:

"Q. * * * Now, did I understand your testimony to be that if you had some other form available you would have written on some other form, is that what you are here saying?

"A. If the company had had in print at that time a joint bond which encompassed both performance and labor and material, we would have executed that form.

---

9. It is of only passing interest to note that Triangle Electric, the plaintiff in this action, was also plaintiff in the Fort Bliss litigation and that the material it supplied in both cases was supplied to Mojave Electric Company. See page 847 of 308 F.2d. Mojave's subcontracts in both cases were bonded by National Union. See pages 49–50 of McKinney deposition.

"Q. And you didn't have such a form available for this, is that right?

"A. To the best of my knowledge, there was none available then and there is none available to-day.

"Q. * * * Have you ever seen a form for a subcontractor on a Capehart job?

"A. I can't recall whether I have or not.

"Q. What did you do when you found you didn't have a form?

"A. Well, the most expedient thing was done, apparently." (Tr. 55–56)

And, after counsel had indicated they had completed their examination, we asked the following questions and received the following answers:

"THE COURT: As I understand your testimony, there was no form whatever prepared by your company that would fit the situation covering liability of a subcontractor under a Capehart job? Did you so testify?

"THE WITNESS: Yes. No, there was no form.

"THE COURT: There just wasn't any animal in existence that fitted that?

"THE WITNESS: Could I elaborate on that a bit?

"THE COURT: Yes.

"THE WITNESS: There is no— we have no company form in print, in print, or that we could have used which would cover a performance and payment obligation in the penal sum of this—or the amount of contract in this instance. It may have been possible to draft one manually, but we never do it, and this has been—not only with National Union Insur-

ance Company but a great many other surety companies, have done the same thing here. They have executed two bonds, with the thought in mind that their liability is limited to the one form.

"THE COURT: Well, this is what I want to get to, because you said because of the absence of this form you felt it was—I think you used the word 'expedient'—

"THE WITNESS: That is right, sir.

"THE COURT:—to actually execute four bonds, and you knew you were actually executing the four?

"THE WITNESS: We knew we were executing four bonds.

"THE COURT: And was it your feeling that by executing the four, you were expediently covering the liability under the Capehart subcontract liability?

"THE WITNESS: And in the terms of the contract between the prime and the subcontractor." (Tr. 66–67).

Of course, at this late in the course of this proceeding,[10] National Union, through Mr. Enders' answers to counsel's leading questions, suggests that it never intended to have more than $530,000.00 exposure. We note the following colloquy:

"Q. (By Mr. Smalley) Mr. Enders, by issuing two bonds on each of these subcontracts, was it the intent and belief of the company that it was doubling its exposure, that it was exposing itself in the amount of twice the contract price?

* * * * * *

"A. It was not the intent of the company to issue two bonds each in the amount—each in an amount equal to the contract price.

10. The whole problem of four versus two bonds, and the extent of National Union's exposure was not injected into this case until shortly before the final hear-

ing. Mr. Enders testified that the problem had been "recalled" to his attention only within the last few weeks before then (Tr. 60).

"Q. The company believed, or the person issuing the bond, at least, since the company is an artificial entity, believed the exposure to have been $330,000 under one subcontract and $200,000 under the other, is that right?

"A. Correct." (Tr. 44).

We have not outlined the testimony as fully as we have for the purpose of indicating our acceptance of National Union's conclusory testimony that it did not intend a bond exposure in excess of $530,000.00. We have made that outline to illustrate the necessity for utilizing aids of construction other than the after-the-fact testimony of the parties in our determination of the intent that must be legally attributed to them at the time the various contractual relations were established.

The evidence in this case makes clear that no one was paying any real attention to the language contained in any of the printed forms of contract that were executed by the respective parties; that the particular language there used was not the subject of negotiation between the parties here involved that could be said to have led to the choice of particular language patterned to fit this particular project. We think the entire record demonstrates that everyone concerned never gave much real thought to what their respective legal rights might or might not be in the event of default.

Our ultimate finding that the amount of National Union's exposure should be limited to $530,000.00 is based upon a specific application of legal principles that we believe must be applied to several aspects of this case. We turn to a discussion of those principles.[11]

## CONCLUSIONS OF LAW

■ In ruling plaintiff's motion for summary judgment on Count I in this case, we took as our point of beginning the legal principle we first announced in United States v. Travelers Indemnity Company, W.D.Mo.1963, 215 F.Supp. 455, namely, that for the reasons stated in detail there (and we again expressly adopt all applicable language here) "the rules of decision that will be applied to the factual situations involved in the various [Capehart Act] cases will be the rules of decision developed under the Heard and Miller Act decisions" (see page 914 of 217 F.Supp.).

Counsel for D & L, appellant in the Court of Appeals, in Triangle Electric, in which we sustained plaintiff's motion for summary judgment (217 F.Supp. 913), contended that we had erred in so ruling. The Court of Appeals, however, held that "[u]pon the record before us, we believe that the trial court properly determined that proposition" (see page 1012 of 332 F.2d).

And in Continental Casualty Company v. Allsop Lumber Co., 8 Cir. 1964, 336 F.2d 445, decided August 26, 1964, (not yet reported), the Court of Appeals discussed in greater detail the rationale of Travelers Indemnity. We have discussed Allsop Lumber in considerable detail in our most recent Capehart memorandum opinion (to which we made reference in footnote 7 above). What we said there need not be repeated here; we again adopt the applicable language for this opinion by this reference.

In general, therefore, it must be said at the outset that our conclusions of law in regard to this branch of this case will rest upon the same base upon which we rested our determination of plaintiff's motion for summary judgment in Tri-

11. Having completed our review of the findings of fact specifically requested by D & L, we state for purposes of the record that we expressly reject all of National Union's suggested findings of fact although it is quite apparent that many of them are quite consistent with the findings we have accepted at the suggestion of D & L. We have adopted this procedure and make this statement in order that the case may be more conveniently briefed in the appellate court should an appeal be ultimately taken.

angle Electric and the various other Capehart cases we have recently decided.

We shall also reiterate in some detail and apply another facet of our determination in Travelers Indemnity (noted with approval on page 451 of 336 F.2d of Allsop Lumber's opinion) that "all substantive provisions of the Miller Act and the Capehart Act were to be read into Capehart bonds."

We recognize, of course, that National Union's subcontractor bonds, strictly speaking, can not be described as either Miller Act or Capehart Act bonds. But that does not answer the question of whether cases construing subcontractors bonds on Miller Act construction projects are to be considered as persuasive in cases in which construction must be given to the similar subcontractors' bonds on Capehart projects. It is our conclusion that reason and the considerations to be presently mentioned require that we again follow the general pattern established by the Miller Act cases although we are dealing with a subcontractor's bond instead of a prime contractor's bond. Such has been the rule applied in Miller Act cases and we believe that logic requires like treatment in regard to subcontractor's bonds in Capehart cases.

Both the payment and performance bonds here involved make specific reference to the subcontracts between D & L and Mojave dated August 18, 1959. Both subcontracts on their faces show that each was identified as a part of the Capehart housing to be constructed at Fort Leonard Wood. Both subcontracts specifically incorporated all the "contract documents" of D & L's prime contract into each subcontract.[12] Paragraph 18 of the General Provisions applicable to all Armed Service Housing Projects, attached to and made a part of the prime contract, demonstrates the interrelation between the prime contract and the contemplated subcontracts to be let under it. By that paragraph the prime contractor is required to insert particular paragraphs of the General Provisions of the prime contract into all subcontracts let under it.

Paragraph 31 of the General Provisions, one of the paragraphs specifically required to be inserted into all subcontracts, provides that accrued payments on advances due the eligible bidder may be withheld in amounts considered necessary to pay laborers and mechanics employed by the eligible bidder or any subcontractor. The substance of that paragraph of the prime contract appears as paragraph 51 of the subcontract. That paragraph of the subcontract, incidentally, provides that "payments or advances" to the subcontractor may be withheld, indicating that "advances" as well as "payments" were within the contemplation of the parties. More broadly, that paragraph illustrates the interdependence of the payment procedures of the prime and subcontracts let under it.

■ All the parties were bound to know the procedures for payments to the prime contractor as detailed in Article IV of the prime contract. All the parties must be held to have known that the prime contractor would be placed in funds to pay for "uninstalled acceptable materials suitably stored on the mortgaged property in a manner acceptable to the Contracting Officer, plus the cost of the portions of the work acceptably completed, as approved by the Contracting Officer, computed in accordance with the amounts assigned to the several items in the Trade Payment Breakdown * * * less 10% and less prior advances."

Although the language is a bit different, Article IV of the Capehart prime contract provides in substance the same familiar payment procedure contained in Article 16 of a regular standard federal construction contract. See U. S. Stand-

12. National Union's argument on page 54 of its argument in support of requested conclusions of law 4 that "the reference in Paragraph 4 of the subcontract to the 'Contract Documents' clearly provides no basis for * * * a wholesale in-

corporation by reference" is untenable. As we shall note later in detail, the subcontracts and the subcontractors' bonds must be read in light of the prime contract and the statute under which the government housing is authorized.

ard Form No. 23 (41 U.S.C.A.App. § 54.13 at page 306). A comparison of U. S. Standard Form No. 25A (41 U.S.C.A. App. § 54.16), the standard federal payment bond, and U. S. Standard Form No. 25–B, the standard federal performance bond (41 U.S.C.A.App. § 54.17), with the payment and performance bonds written by National Union in this case, reveal a great similarity in substance, although again, there is some slight difference in form of language.

The language in the payment bonds issued by National Union in this case contained an express recognition that Mojave would make prompt payment for materials furnished under the terms of the contract "whether or not the said materials or labor entered into and became component parts of the work or improvement contemplated in said contract." It is therefore apparent that National Union, as the compensated surety, wrote a bond in which it expressly recognized what its witness, Mr. Enders, testified was "a normal condition or item" in any construction contract, namely, "that a contractor would get paid for on-site material, materials which are stored on the job site, and presumably for which he is being billed or has been paid for" (Tr. 54). As Mr. Enders correctly explained, "This happens in every contract,

whether it is Capehart or anything" (Tr. 54).[13]

It is well known that the utilization of bonds on subcontracts increased following the decision of MacEvoy v. United States, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). On page 110 of that case, the Supreme Court commented on the "practical considerations" that must be taken into account by a court faced with the construction of the language of the Miller Act and of the bonds required thereunder. It was there noted that "[i]t is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors."[14]

Judge Matthes' opinion in American Casualty Co. of Reading, Pa. v. Brezina Const. Co., 8 Cir. 1961, 295 F.2d 603, dealt directly with the problems of what rules of construction should be applied to a bond of a subcontractor on a Miller Act project which had been required by the prime contractor. In that case Brezina was the prime contractor, bonded under the Miller Act by General Insurance Company of America.

Brezina subcontracted the plumbing and heating portion of the prime contract to A & A Contractors, Inc. As was true

---

13. It should be noted, as we now turn to a discussion of comparable Miller Act cases, that National Union also wrote Miller Act bonds and therefore must be held to be acquainted with the standard government payment procedures on such construction projects. We also again note, as we earlier noted in footnote 41 on page 471 of 215 F.Supp., in our memorandum opinion in Travelers Indemnity, that surety companies view the risk on construction bonds on government housing built under the Capehart Act as the same sort of risk as is involved on bonds required by the Miller Act on other government construction, and that, accordingly, such companies charge the same premiums on Capehart bonds as they charge on Miller Act bonds.

14. The quoted language is a direct paraphrase of the language of United States, for Use of Hill v. American Surety Co., 200 U.S. 197, 204, 26 S.Ct. 168, 50 L.

Ed. 437 (1905), construing the Act of 1894, Mankin v. United States, for Use of Ludowici-Celadon Co., 215 U.S. 533, 540, 30 S.Ct. 174, 54 L.Ed. 315 (1910), construed the Heard Act of 1905, accepted what had been said in Hill, and pointed out still another way a prime contractor could protect himself, i. e., by requiring that payments on the subcontract would be withheld until full releases for material and labor contracted by the subcontractor be furnished by the subcontractor to the prime contractor. Of course, if the subcontractor is required to and does in fact furnish a bond, then the prime contractor lets the surety worry about obtaining the releases because the failure of the subcontractor to pay his suppliers is the exact condition of the bond. Such has been the law and the practice in the construction industry for over a half century.

in this case, Brezina, the prime contractor in the cited case, provided in its subcontract that its subcontractor, A & A, would furnish a bond in the full amount of the subcontract. American Casualty Company wrote the subcontractor's bond there involved.

Lennox Industries supplied materials to the subcontractor A & A, who failed to pay for them. In much the same manner as plaintiff in this case, Lennox, the supplier, sued A & A, the subcontractor, and its surety, American, and Brezina, the prime contractor, and its surety, General American. As in this case, Brezina, the prime contractor, filed a cross-claim against its subcontractor, A & A, and its surety, American, praying that any judgment recovered against Brezina be recovered from A & A and its surety.

The district court rendered judgment for Lennox against A & A, Brezina and its surety, but also granted judgment in favor of Brezina on its cross claim against A & A and its surety, American. American appealed.

The Court of Appeals affirmed. It held that the subcontractor who had agreed to "furnish all materials" did not do so when he failed to pay for them and that so far as liability under the bond was concerned "the conclusion is impelled that liability attached under the bond because A & A, the principal, failed to 'conform and comply with the terms and conditions of the contract'" (l. c. 607 of 295 F.2d).

Brezina Const. Co. announced and applied two rules of construction applicable to subcontractor's bonds furnished on a Miller Act project. The first rule was stated in footnote 6 on page 607 as follows:

"The rule that the surety is a favorite of the law and that his bond should be strictly construed does not apply to surety companies organized for a profit, or to compensated surety."

The second rule of construction was stated in footnote 7 on page 607 as follows:

"Under a recognized rule of construction, the instant bond must be viewed and interpreted in light of the provisions of the subcontract and the general contract, which by appropriate reference forms a part of the subcontract. Annotation 77 A. L.R. 46; 72 C.J.S. Principal & Surety, § 100, p. 579; 50 Am.Jur., Suretyship, § 31, p. 923. Consideration of the subcontract and instant bond, *in light of the general contract and statute,* clearly indicates Brezina's intention to fully protect itself to the extent that it was liable for payment of materials furnished to a subcontractor, and of A & A and its surety to accept this liability." [emphasis ours].

Both rules are reiterated and applied to subcontractor's bonds on a Miller Act project in Home Indemnity Company v. F. H. Donovan Printing Co., 8 Cir. 1963, 325 F.2d 870, 874. In that case it was held:

"It is a fundamental rule of construction that where the contract which is the subject of the performance bond is referred to in the latter, that the contract is to be regarded as a part of the undertaking of the surety under the bond. Massachusetts Bonding & Insurance Co. v. Feutz, 8 Cir., 182 F.2d 752, 756–757 (1950); United States v. Phoenix Indemnity Co., 4 Cir., 231 F.2d 573, 575 (1956). It is equally well-settled that where, as here, there is a compensated surety, the performance bond and the contract upon which it is based are construed most strongly against the surety and in favor of indemnity. American Casualty Co. of Reading, Pa. v. Brezina Const. Co., 8 Cir., 295 F.2d 603, 607, fn. 6 (1961); Massachusetts Bonding & Insurance Co. v. Feutz, supra, 182 F.2d [752] at 756."

■ Brezina Const. Co., we think, makes quite clear that it applied the rules of decision developed under actions upon Miller Act prime contractors' bonds quite freely to an action which, on the facts,

involved a subcontractor's bond. Judge Matthes definitively held that the sub-contract and the subcontractor's bond both had to be considered "in light of the general contract and statute," which, of course, brought the Miller Act prime contractor bond cases into play. Such a view of our controlling court commands the conclusion that the fact that a subcontractor's bond, as factually distinguished from a statutory prime contractor's bond, may be involved in a particular case presents merely a factual difference but not a valid ground for legal distinction.[15]

We believe that Judge Matthes had this thought very much in mind when he said that a "contractor * * * does not comply * * * by simply placing the material on the ground and leaving it to the owner or, in this case, the prime contractor * * * to pay for it." (l. c. 607 of 295 F.2d). It would be an "owner" in the factual situation in which a prime contractor's bond is involved; it would be a "prime contractor" in the factual situation in which a subcontractor's bond is involved. In the latter factual situation, just as in the former, Brezina Const. Co. holds that the sub-contract and its bond must be considered "in light of the general contract and statute."

The application of that rule of construction required the holding that it must be held that it was the intention of the subcontractor and of its surety to accept and bond the liability that the prime contractor intended to protect itself "to the extent that it [the prime contractor] was liable for payment of materials furnished to a subcontractor."

Allsop Lumber makes clear beyond further contention that the liability that D & L sought to protect itself against was the liability imposed by the Capehart Act, which has been held to confer substantive bond protection essentially similar to that afforded Miller Act suppliers. Brezina Const. Co. formulated rules of construction to be applied to subcontractor bonds on Miller Act projects that enables contractors, subcontractors, their suppliers and their sureties to understand that the extensive body of law applied to the construction of the bonds of prime contractors is to be applied to the bonds of subcontractors written to protect that liability in accordance with the well-known comment in MacEvoy and the earlier Supreme Court cases.

Allsop Lumber also expressed a desire to avoid the introduction of "further complications into an already too complicated area by the development of technical niceties of distinction" (page 452 of 336 F.2d). We need not develop again our reasons for seeking uniformity in connection with all the various problems growing out of the extensive Capehart litigation with which we have dealt. We did so fully in Travelers Indemnity (see particularly pages 466–475 of 215 F. Supp.) and incorporate by this reference what we said there.

We not only believe those considerations are still valid but we also believe that the manner in which the parties conducted themselves in connection with the subcontractor's bond here involved can be explained only on the basis that they somehow instinctively knew that the obligation being accepted was in fact spelled out in the statute under which the

15. If strict logic is insisted upon to support Judge Matthes' rationale, it could well be reasoned that cases concerning prime contractors and their bonds, which unquestionably must be read in light of the statute, are applicable to cases concerning subcontractors and their bonds, because it must also be said that the subcontracts are to be read in light of the prime contracts under which they are written and because that light requires not only the reading of the prime contract alone, but also a reading of the statute. All of this is to say that the parties to the subcontract and its bond on a government housing project intend that their legal rights and duties are to be determined by reading the subcontract and its bond in light of both the prime contract and the statute. The experience of the construction of government projects is consistent with this logical approach.

Capehart Housing was authorized. The conduct of National Union in this case cannot be explained on any other reasonable basis.

■■ We are convinced that because our controlling court has now so clearly identified the essential similarity between the substantive rights of all parties under the Capehart Act with the well understood rights of all parties under the Miller Act that we must once again make application not only of rules of decisions developed under the Miller Act to the bonds of a Capehart prime contractor, but that we must also apply to Capehart subcontractor's bonds the rules of construction that have been held to be applicable to subcontractor's bonds written on Miller Act bonded projects. We so hold.

Neither of the parties briefed this case on the theory that our consideration of the subcontract and the bond must be in the light of the prime contract and the Capehart Act. Nor have either of the parties discussed the question of whether the rules of construction established by Brezina Const. Co. for subcontractor's bonds on Miller Act projects should be applied to the subcontractor's bond involved in this case to the end that, to use Brezina Const. Co.'s language, the facts here involved "clearly indicates [D & L's] intention to fully protect itself to the extent that it was liable [under the Capehart Act] for payment of materials furnished to a subcontractor, and of [Mojave] and its surety [National Union] to accept this liability."

National Union's arguments in this case proceed upon an unstated assumption that we ruled to be invalid in Travelers Indemnity. In that case, the surety

companies argued that a prime contractor's bond under the Capehart Act was just an ordinary bond similar to those in use in any other private construction project (see page 466 et ff. of 215 F.Supp.). We rejected that argument and held that "all substantive provisions of the Miller Act and the Capehart Act would be read into all performance and payment bonds required in connection with any government housing project constructed under the Capehart Act" (l. c. 463 of 215 F.Supp.).[16]

National Union, in an obvious effort to avoid the implication of knowledge of the well-established payment procedures on all government construction contracts, which results from a reading of the subcontract and its bond in the light of the prime contract and the statute, contends that "the provisions of the subcontracts themselves * * * are alone controlling" (L-4, 53);[17] that the provisions in Art. IV (7) of the prime contract "* * * permitting progress payments based upon a percentage of the cost of 'uninstalled materials suitably stored on the mortgaged property in a manner acceptable to the Contracting Officer' * * * are entirely inapplicable and uncontrolling on the issue whether payments by D & L to Mojave * * were timely and proper" (L-4, 53); that the "payment provisions of the prime contract were 'nowhere referred to or incorporated by reference in the subcontracts'" (L-4, 53); and that "there is no evidence that the surety ever even had available to it a copy of the prime contract" (53).

We have already found against National Union's argument that the prime contract was not incorporated and made a

---

16. We incorporated that holding by reference into this case in our ruling on plaintiff's motion for summary judgment. See page 914 of 217 F.Supp. That particular determination was approvingly noted by specific paraphrase on page 451 of the opinion of the Court of Appeals in Allsop Lumber.

17. References to "(L-4, 53)" indicate National Union's Requested Finding of Law

L-4 and page 53 of the argument in support. References to "(F-1, 1)" are to National Union's Requested Findings of Fact and the appropriate page of the argument in support. A single page reference such as "(53)" refers to a portion of the argument in support of either a requested conclusion of law or finding of fact.

part of the subcontract. Exhibit AA, relating to the interior electrical bond, and Exhibit BB, relating to the exterior bond, both introduced by National Union itself, were admitted in evidence at the hearing (Tr. 33). Those exhibits show on their face that both the prime contract and the subcontract were attached to those exhibits and received by National Union.

The two provisions of the subcontracts upon which National Union attempts to base its ultimate material variance argument can not be read to mean what National Union now would say that they were intended to mean. Those two clauses are quoted in paragraph 32 of findings of fact above. National Union has requested that we find that the payments made to Mojave after the December telephone call were material departures from the terms of the subcontract because the payments were not for "material and labor in place," nor were the payments "based on actual progress," within the meaning of the subcontract's language (F–27, 29). National Union also requested that we conclude that the phrase "material and labor in place" cannot be said to "embrace materials merely on order by the subcontractor, or materials received and stored by it on the job-site" (L–5, 55). It is also contended that the phrase "payment to be based on actual progress" of the subcontracts should be held to mean that "payments to the subcontractor were to have been based only upon work actually done, and materials actually used, in installations and structures" and that the "mere delivery of materials to the job-site, and stockpiling of materials thereon, was not 'actual progress', within the meaning of the phrase" (F–6, 59). And finally, National Union contends that "paragraph 9 of the subcontracts must be read as *requiring* not just permitting D & L to require, that Mojave submit releases, receipts or other vouchers evidencing payment for materials and labor before any part of the subcontract amounts could be made to it" (emphasis National Union's, 63).

We expressly refuse to make the requested findings and reject National Union's argument as summarized in the preceding paragraph. An application of the rationale of Brezina Const. Co. requires that we not read those clauses in isolation but that they must be considered in light of the requirements of the prime contract, the statute authorizing the government construction and in light of the obvious intention of the parties at the time the bonds involved were written.

In so holding, we have not overlooked National Union's other arguments that are threaded throughout its request for findings and conclusions that run to the effect that D & L should be held to have known that the surety "would rely for its [i. e., National Union's] own protection upon the same strict compliance with all subcontract terms which was called for by the subcontracts themselves" (F–8, 8); that D & L, not National Union who bonded the subcontracts, was under duty to "take some sort of action, by executing progress payments to Mojave and materialmen jointly, or otherwise, to satisfy itself that materials and labor furnished to Mojave were duly paid for" (L–9, 67); that D & L was "the only person capable of enforcing those protective measures" (67); that somehow, when a prime contractor requires a subcontractor to furnish a bond, and when such a bond is in fact furnished, the prime contractor has not legally protected himself in what MacEvoy called an "easy way," but that the prime contractor, under those factual circumstances, "becomes, in effect, a trustee for the surety" (71) and under some assumed duty to the subcontractor's surety to take the sort of protective measures for the surety's benefit that it would have been forced to take for its own protection only in the event the subcontractor should have been unable to furnish a bond; and finally, that "if D & L *had* followed closely the payment procedures it had itself written into the subcontracts * * there would have been no unpaid materialmen, since Mojave would have been

required itself to pay for materials before it requisitioned for payment from D & L on the basis of them" (87).[18]

All of National Union's arguments in the foregoing paragraph again attempt to avoid the legal consequences that follow from an application of the rule of construction that requires that the intention of the parties be determined from the subcontracts and their bonds read in the light of the prime contract and in the light of the statutes under which the government housing project was being built. We refuse to depart from that basic legal proposition and therefore expressly reject National Union's additional requests and the arguments made in their support.

We have outlined National Union's requests and have stated its supporting argument in detail in order to make clear for possible appellate review our total rejection of National Union's legal theories. For the purpose of further clarification, we find and conclude that the phrases "material and labor in place" and "based on actual progress," and the phrase conferring an optional right on D & L to demand payment evidence from Mojave, all as set forth in the subcontracts, must all be read in light of the prime contract and the statute under which the government housing was being constructed.

█ When viewed in that light, it is clear to us that all parties, including National Union, must be held to have understood and intended that the payments would be made for material inventory as well as physical progress in accordance with established payment procedures on all government construction contracts; that payments in this particular case would be made by the prime contractor to its subcontractors in accordance with Art. IV (7) of the prime contract on "uninstalled acceptable materials suitably stored on the mortgage property in a manner acceptable to the Contracting Officer;" and that the specific obligation being bonded by National Union was Mojave's duty to pay for those materials, either with the money it received on its draw from the prime contractor (as is the usual case) or with other funds of its own.

It is also clear to us that all of the conferences, telephone calls, telegrams, and conversations concerning the payment of Mojave's requisitions for funds revolved around the fact that D & L was obviously unwilling to release substantial funds to Mojave until and unless Mojave furnished the bond required of it by the subcontract. It is equally clear to us that all parties must have fully understood each other on that score and that National Union can not now be heard to say that it was not bonding the performance of a subcontract entered into on August 18, 1959, which, because of the amounts involved in the requisitions, it must be held to have known had been in the course of substantial performance for some considerable period of time.

Under these factual circumstances, we find that when National Union accepted the liability on Mojave's bonds it quite evidently elected to rely only upon its exceedingly inadequate investigation of Mojave's financial condition and the indemnity agreement it had obtained from Mojave's president and his wife on April 23, 1959 (Kaufman, Ex. K–2), and that it did not believe it needed to investigate further.

█ Certainly the record is silent as to any real investigation, on job-site or otherwise, that National Union made concerning the progress of the work that had been performed on subcontracts it was bonding. And more important, the record is completely silent as to any precaution whatever that National Union took in regard to either investigating or working out the sort of practical arrangement

---

18. Exactly where Mojave was going to get the money except from a distribution of the prime contractor's draw is not suggested by National Union. In regard to the last clause of National Union's argument, it might just as well argue that if D & L, Mojave, and National Union had never heard of the Fort Leonard Wood Capehart project, the present lawsuit would not be pending in this Court.

that is usually worked out in similar factual situations, namely, that National Union would accept liability on the subcontractor's bond only if it were assured that the money being paid the subcontractor on the then current requisitions would be paid into a bank account jointly controlled by the subcontractor and the surety so that the surety would have an effective means of seeing that the payments made by the prime contractor to the subcontractor would in fact reach the material suppliers in order that there would be no breach of the bond. National Union failed to take the usual steps to protect itself at the time of its acceptance of bond liability; it cannot claim exoneration on its compensated surety obligation on the theory that others failed to establish payment procedures that National Union did not see fit to establish for its own protection.

█ Neither D & L, nor Mojave, nor was anyone else under any duty to protect National Union from either the negligence or the incompetency of its own agents. Nor can it fairly be said that this record supports any finding that National Union did in fact rely upon any term or phrase of the subcontracts. On the contrary, the record is quite clear that National Union fully understood that its security was "either the work performed to date or materials on site" (Tr. 42), and that it was a "normal condition * * * that a contractor would get paid for on-site material, materials which are stored on the job site" and that this is true "whether the contract is a Capehart or any other sort of contract" (Tr. 54).

To further sharpen our findings and conclusions we shall make the definitive determinations requested in subsection C of the final amended pre-trial order entitled "Issues of Fact and Contention of Parties." We shall thereafter state appropriate conclusions on the issues of law outlined in subsection D of that order entitled "Issues of Law."

█ The following findings and conclusions are therefore keyed to the paragraph numbers of the final amended pre-trial order: [19]

"30 (a) The manner in which the prime contractor made periodic progress payments to Mojave did not vary from the terms and conditions set forth in the subcontracting agreements in any material respect.

"(1) The parties contemplated, intended, and understood that payments would be made for materials inventoried on the construction site but not actually incorporated into the work;

"(2) Mojave was not required by D & L to, and did not, nor was D & L under any contractual or other legal duty to require that Mojave submit with its applications for payments releases, receipts, or other vouchers evidencing payment by Mojave for labor and material.

"(3) All payments were 'based on actual progress' within the meaning of that phrase as used in the subcontracts.

"(b) None of the payments materially affected the nature and/or extent of, or the risk involved in National Union's obligations on each of its bonds.

█ "(c) Defendant National Union has not shown, nor does any evidence show that any prejudice resulted to it under all of the facts found herein.

"(d) National Union is not released from any of its liability on the bonds here involved.

19. We recognize that several of the following numbered paragraphs, duplicate particular findings and conclusions already made and stated. We believe, however, that the parties are entitled, for purposes of possible appellate review, to have the specific questions of fact and law presented to us by their stipulations and by pre-trial order answered in language appropriate to that agreed upon by them.

"(e) The prime contractor's payments to Mojave were made with the knowledge and consent of National Union.

"31. We agree with D & L's contention that it is apparent from the above facts that no alleged alteration did materially affect the nature and/or extent of, or the risk involved in National Union's obligations on each of its bonds. We reject National's contention that the facts show that National was in fact deprived of security to which it was entitled under the terms of the subcontracts.

"32. We reject National Union's contention that as a matter of law it has no burden of proceeding with evidence of resultant prejudice."

Under the facts and applicable law as we have found it, it is unnecessary to reach National Union's contention that under California law, which it argues is applicable by reason of a provision in the subcontracts that provides that "this contract shall be interpreted pursuant to the laws of the State of California," the surety should be completely discharged under the operation of Section 2819 of the California Civil Code.[20]

Since we have found no material alteration occurred either in fact or in law, the question posed in paragraph 33 of the amended pre-trial order as to whether a discharge should be considered as complete or only *pro tanto* is academic. Our findings, of course, also made academic the question of law posed in paragraph 36(a) below as to whether California or Missouri law is controlling in regard to the interpretation of the subcontracts or the bonds securing their performance and other questions. We have found that we must consider both those instruments in the light of the prime contract and the statute.

 Continuing from the paragraphs of the amended pre-trial order, we find and conclude that:

"34. The facts show the knowledge and consent of National Union, through its agent, to the making of the challenged payments.

"35. The separate payment bonds sued upon were issued by National Union as a result of a mistake, which should not be held to increase the limits of liability established by the performance bonds written on each subcontract in the full amount of the subcontract price.

* * * * * *

"36 (b) The prime contractor did not alter the terms of its subcontract in paying Mojave for material inventoried on the site and not actually incorporated in the work.

"(c) The prime contractor did not alter the terms of its subcontract in not requiring Mojave to submit with its applications for each payment releases, receipts, or other vouchers evidencing payment for materials and labor, or any additional evidence bearing on the right of Mojave to such payments.

"(d) The prime contractor did not alter the terms of its subcontract in regard to the 'based on actual progress' language used in the subcontracts.

"(e) Under the facts and applicable law, there were no alterations material to the nature and/or extent of, or the risk involved in, National Union's obligations on the bonds in question.

"(f) National Union would have had the burden of showing the fact and extent of any prejudice suffered by it as a result of any and all of the claimed alterations.

20. The statute provides that: "A guarantor is exonerated * * * if by any act of the creditor, without the consent of the guarantor, the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, are in any way impaired or suspended."

"(g) The question of whether National Union would be released from its obligations on any of the bonds, *in toto* or *pro tanto,* is not reached for the reasons stated elsewhere.

"(h) The question of whether Mojave had any obligation, when requesting that National Union issue the performance and payment bonds sued upon, or at any time thereafter, to inform National Union that a progress payment of $50,000.00 had already been made by D & L to Mojave, need not be determined because we find National Union either knew or should have ascertained on its own behalf that fact before it accepted liability on the bonds it issued.

"(i) D & L did not, under any circumstance, have any obligation, when it inquired whether National Union had in fact issued the performance and payments bonds sued upon, or any time thereafter, to inform National Union that a progress payment of $50,000.00 had already been made by D & L to Mojave.

■ "(j) D & L may assert all its rights against National Union under the payment bonds issued by it to secure payment to persons furnishing materials used in the subcontracts."

The other subparagraphs of paragraph 36, subparagraphs (k) through (o), inclusive, relate to questions that concern particular items of damage, including the question of whether attorneys' fees for defending materialmen's suits and for prosecuting this cross-claim should be allowed D & L as damages under the bond. The briefs of the parties have injected some additional questions concerning damage into the case.

Before directing further proceedings, but without getting involved in specific dollar amounts of damages and their allocation, we think it will be helpful to make definitive rulings in regard to several of the contentions made by National Union

in regard to the extent of its liability on the bonds. We believe that specific discussion of particular requests made by National Union in regard to damages will aid the parties in connection with their work on the form of the final judgment.

We expressly reject National Union's request that the $143,621.00 payments "be subtracted from the total damages" (L–16, 99 and L–17, 102).

We expressly reject National Union's request that we find that it can not be held liable "in an amount greater than $20,625.00, the amount by which the subcontract prices agreed upon by D & L, on the one hand, and Modern and Carter, on the other [Modern and Carter were take-over contractors employed by D & L when National Union refused to take over completion of Mojave's defaulted contract] exceeded the amounts of the two Mojave subcontracts" (L–K, 103).

National Union, admittedly without supporting authority, suggests that the failure of Modern and Carter to complete within the amounts specified in their respective take-over contracts somehow excused National Union from its surety obligation that Mojave would "promptly make payment of all just claims for materials and labor supplied or performed in the prosecution and completion of the work to be done" (quoted from the payment bond), and its surety obligation that Mojave "shall well and truly perform and carry out the covenants, terms and conditions of said agreement" (quoted from the performance bond).

National Union seemingly was unfamiliar with the usual action and practice taken by surety companies in the event of default of their principal on a construction project, either government or private. National Union, however, concedes that it could have "undertaken completion" (103) and thus have maintained its own control of the completion costs.

■ But National Union elected not to follow that course. It elected to rely

upon the alleged defenses which we have refused to sustain, and, in effect, to leave D & L without any benefit of the protection of the bonds whatever. Finding itself now in a quite radical legal situation, National Union attempts to argue that D & L violated all sorts of legal duties allegedly owed National Union to have protected National Union's interests in a manner more adequate than National Union could have protected itself. National Union argues that because D & L entered into take-over contracts for the same amount of money provided for in the original subcontracts that it [D & L] somehow elected to rely upon its contract rights against the take-over contractors, and therefore "put an end to any chain of causation stemming from Mojave's default, and thereby fixed the maximum damages for which the latter might be held accountable" (104). National Union attempts to press this argument to its logical extreme by even suggesting that if D & L were permitted to recover in accordance with the conditions of the bonds any recovery above the amount of the take-over contracts would "shift the burden of their [the take-over contractors] defaults to National [Union]" (104).

We reject National Union's arguments in their entirety. We hold that the amounts specified in the take-over contracts have absolutely no bearing on the completion costs of the subcontracts bonded by National Union and that such amounts have no relevancy whatever in the calculation of the amount of damages to be assessed on the bonds.

For similar reasons, we reject National Union's requested conclusion L-23 which suggests that "in calculating damages due D & L * * * National Union must be credited with the full amount of the unpaid subcontract price in each case—$261,627.00 in the case of the interior electrical subcontract, and $124,752.00 in the case of the exterior electrical subcontract, or a total under both subcontracts of $386,379.00" (L-23, 115). We hold that the only limitation on National Union's obligation is that set forth in the respective bonds executed to insure the performance of Mojave and the payment by it of all just claims, namely, $330,000.00 in the case of the interior electrical subcontract, and $200,000.00 in the case of the exterior electrical subcontract.

There remains for discussion only the items of attorneys' fees, pre-judgment interest, the "managerial and administrative service" item, the allocation of the General Electric settlement, and an apparent misunderstanding concerning the right granted National Union to examine supporting data concerning certain completion cost items at the time of the hearing.

We had considerable to say about an aspect of attorneys' fees and interest in this general type of litigation in our decision in Triangle Electric. The situation presented on this branch of the case is a bit different than the narrow questions we ruled on summary judgment in regard to plaintiffs' claim.

We note, however, that in connection with at least the attorneys' fee item of damage on the exterior subcontract, any decision in regard to that particular item might be moot in the event we should sustain, as we have, National Union's contention that the liability on that particular bond is not double the contract price, even though four, rather than two, bonds were actually executed.

Because the same situation may well exist in regard to other items and because we are confident that counsel are more familiar with the dollar amounts of all items than we are, we have decided not to attempt any final assessment of damage in this opinion.

In order, however, that final judgment be entered promptly, we direct that counsel for D & L within ten (10) days prepare a final order in accordance with the factual and legal determinations made herein and submit the same to counsel for National Union for approval as to form. If National Union's counsel are unable to agree with D & L's counsel on the form of final judgment within a

period of five (5) days after submission to them, counsel for both parties shall immediately advise the Court so that further proceedings may be directed after conference. We again thank counsel for both parties for their continued assistance and cooperation.