**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Appellant,**

**v.**

**D & L CONSTRUCTION CO. et al., Appellees.**

**D & L CONSTRUCTION CO. et al., Appellants,**

**v.**

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Appellee.**

**Nos. 18013, 18014.**

United States Court of Appeals
Eighth Circuit.

Nov. 18, 1965.

Rehearing Denied Dec. 27, 1965.

Douglas Stripp and Clayton R. Smalley, Kansas City, Mo., for the National Union Fire Ins. Co. of Pittsburgh.

John A. Biersmith, Kansas City, Mo., for the D & L Construction Co., et al., on brief with Charles J. Fraas, Jr., Kansas City, Mo.

Before VOGEL, Chief Judge, and VAN OOSTERHOUT and MEHAFFY, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National) appeals from a judgment entered in favor of D & L Construction Company and Associates (D & L) for $711,528.55, such judgment being for the principal amount of bonds issued by National on behalf of Mojave Electric Company (Mojave) and determined by the court to be in the amount of $530,000 plus attorneys' fees and interest. D & L is the prime contractor on a contract awarded it under the Capehart Act, 42 U.S.C.A. § 1594 et seq., for the building of 700 residential units at Fort Leonard Wood, Missouri. Mojave had two subcontracts on the project; one for $200,000 for the exterior

electrical work and another for $330,000 for interior electrical work. National was the compensated surety on the payment and performance bonds demanded by and furnished to D & L, the prime contractor, on behalf of Mojave. National executed and delivered to D & L four bonds totalling $1,060,000, to-wit, (1) a performance bond on the $330,000 interior contract; (2) a payment bond on the $330,000 interior contract; (3) a performance bond of $200,000 on the exterior contract; and (4) a payment bond of $200,000 on the exterior contract.

By cross-appeal, D & L raises the issue that the court erred in denying it full coverage on the four bonds just described and in limiting the aggregate bond coverage to $530,000—$330,000 on the interior and $200,000 on the exterior.

Mojave defaulted on its subcontract. National, when given timely notice of the default, refused to complete the work which Mojave had contracted to do. D & L completed the subcontract work and claims as damages on the bonds the completion costs plus attorneys' fees and interest.

The facts, many of which are stipulated, are set out in the trial court's opinions reported Triangle Electric Supply Co. v. Mojave Electric Co., D.C., at 234 F.Supp. 293 and 238 F.Supp. 815. Detailed findings of fact and conclusions of law are there set out as well as a discussion of the court's view of the applicable law. We shall not attempt to set forth the rather lengthy and involved factual history in detail here, but will discuss the facts necessary in the course of the cpinion.

I. CHOICE OF LAW

Before turning to the substantive legal issues, this court must determine the body of law which governs this appeal. Both agreements between D & L and Mojave specifically stated, "This contract shall be interpreted pursuant to the laws of the State of California." National argues that such specific intent in the subcontracts must be read into the bonds referring to the subcontracts and that

California law should control. We disagree. Parties' specific intention concerning what law will control their agreements is binding on courts only where there is a logical basis for applying such law. See 17 C.J.S. Contracts §§ 12(3), 12(4); Weintraub, Contracts and Conflicts of Laws, 46 Iowa L.Rev. 713. National is a Pennsylvania corporation, not a California corporation. The bonding agreement with National was negotiated in the state of Louisiana. The bonds were executed on behalf of National by a Missouri agent. The performance and payment bonded was to be carried out entirely in the state of Missouri. The bond makes no specific provision as to controlling law. Such circumstances show the lack of a logical basis for recourse to California law in this case.

More significantly, this controversy grows out of events in the performance of a Government contract, the prime Capehart contract between D & L and the United States. This court has outlined at some length the federal interest inherent in Capehart projects. Continental Cas. Co. v. Allsop Lumber Co., 8 Cir., 336 F.2d 445, 449–452. See United States for Use and Benefit of Fine v. Travelers Indem. Co., W.D.Mo., 215 F.Supp. 455, 466–474. In such cases, this court has specifically held with respect to Capehart cases that "the rules of decision that will be applied to the factual situations involved in the various cases will be the rules of decision developed under the Heard and Miller Act decisions." D & L Constr. Co. v. Triangle Elec. Supply Co., 8 Cir., 332 F.2d 1009, 1012.

The Capehart Act requires payment and performance bonds of the prime contractor. There is no specific requirement that the subcontractor furnish bonds. In American Cas. Co. of Reading, Pa. v. Brezina Constr. Co., 8 Cir., 295 F. 2d 603, the surety on a Miller Act subcontractor's bond was held to the same rules of construction and contractual liability as the surety for the prime contractor by this court. The instant situation is directly analogous. The trial court properly determined that the controlling law is the federal law developed under the Capehart, Heard and Miller Acts.

## II. D & L CROSS–APPEAL.

Consideration will first be given to D & L's cross-appeal as the determination of the issue there presented with respect to the amount of bond coverage has a direct bearing on some of the issues presented by National's appeal.

D & L contends that National is legally obligated on the two performance bonds and on the two payment bonds heretofore described, aggregating $1,060,000 coverage, and that the court erred in determining that National's bonds coverage was limited to $530,000, the amount of the subcontract.

We have difficulty in determining the precise legal basis upon which the trial court determined this issue. The terms of the bonds are clear and unambiguous and on their face provide a total coverage of $1,060,000. The trial court, at pp. 302 to 309 of 234 F.Supp., sets out facts bearing upon this issue and at finding 35 on p. 314 states:

"The separate payment bonds sued upon were issued by National Union as a result of a mistake, which should not be held to increase the limits of liability established by the performance bonds written on each subcontract in the full amount of the subcontract price."

Apparently upon the basis of our decision in Brezina, supra, the court determined that the performance bonds covered payments due material suppliers and laborers and that the payment bonds here issued were surplusage and issued by mistake. We adhere to our holding in Brezina. We there held that under the circumstances of that case the performance bond covers material claims for which the prime contractor was legally responsible. Conflicting cases are discussed. Our holding is limited to the facts there presented and such case does not go to the extent of holding that a performance bond will under all circum-

stances cover all of the liabilities contemplated by a payment bond. The case does not deal with the issue of the validity and effect of a validly issued payment bond.

The subcontract pursuant to which the bonds here involved were issued provided for "a performance and payment bond" for not less than 100% of the subcontract price. Clearly the parties had a right to contract for a specific performance and payment coverage.

National in its brief does not attempt to uphold the theory upon which the trial court resolved this issue. In its brief, it states:

"The case evidenced by the record is a clear and simple instance of mutual mistake as to the legal effect of the instruments in question.

\* \* \* \* \* \*

"Doubtless a lawyer under these circumstances would have realized that the legal effect of thus issuing four bonds rather than two would be to afford coverage in double the amount requested.

\* \* \* \* \* \*

"Double the contemplated protection resulted from a mistake as to the legal effect of the use of separate payment and performance bonds—a mistake of law which, while it might seem 'incredible', is nonetheless clearly shown by the evidence to have occurred. If we are to be charitable to D & L and Mojave, the mistake should be classed as 'mutual.' A less charitable interpretation of the evidence, probably undeserved, would convict both Mojave and D & L of having, with full awareness of National's unintended largess, accepted their windfall without a murmur. In either case, the trial court's reformation of the bonds to accord with all of the parties' true intentions was the only result consistent with law, equity, and good conscience."

In response to a question from the court in oral argument, counsel for National conceded that the bonds as written were unambiguous and created liability and that reformation was essential to entitle National to relief. The trial court did not expressly find National was entitled to reformation. However, since reformation if available would support the trial court's decision on the issue raised by the cross-appeal, we shall determine whether National has established a right to reformation.

There is no evidence to support a finding of mutual mistake. If any mistake was made by National, the mistake was one of law. The bonds were contracted for and executed by an authorized New Orleans agency of National under power of attorney pursuant to a general line of credit of $2,000,000 previously extended Mojave. No combination payment and performance bond forms were available, so the agents chose to execute and deliver separate payment and performance bonds covering each subcontract, and such bonds were delivered to D & L. D & L had nothing to do with the preparation of the bonds or the choice of forms used. The New Orleans office handled the transaction. There is no testimony on the part of anyone connected with that ageny to the effect that any mistake, either of law or fact, was made. Enders, a company underwriter at the home office who had nothing to do with executing the bonds, while testifying as a witness insisted the company had made no mistake in delivering the four bonds. Included in his testimony is the following: "You really did intend to sign four bonds then, is that your testimony? A. I said—yes, sir. Q. Oh, I see—A. I didn't—at no time did I say we didn't intend to sign four bonds." Mr. Enders did testify that the company in signing the bonds did not intend an exposure in excess of the subcontract price. Thus, all there is in evidence on mistake is the testimony of an underwriter who had nothing to do with the issuance of the bonds, that the company did not intend to give double coverage. At most, the evidence establishes a unilateral mistake of law on the part of National.

Courts have been wary of granting reformation for a mistake of law

without more. Here this court finds no more than a plain mistake of law concerning the effect of a written instrument·by a party in the business of executing such instruments. Reformation cannot be granted in such circumstances. 76 C.J.S. Reformation of Instruments § 27; 17 C.J.S. Contracts § 145; 45 Am. Jur. Reformation § 50; 11 Appleman Insurance § 6809.

■ In order to establish a right to reformation, the burden is upon the party claiming relief to establish mutual mistake by clear, satisfactory and convincing evidence. C. S. Foreman Co. v. Great Lakes Pipe Line Co., 8 Cir., 274 F.2d 61, 65; 76 C.J.S. Reformation of Instruments § 82b.

■ Reformation may be granted when mistake exists on one side and fraud or inequitable conduct on the other. 76 C.J.S. Reformation of Instruments § 29. There is absolutely no evidence here of fraud or inequitable conduct on the part of D & L. If National voluntarily chose to fulfill its contractual obligation by furnishing separate performance and payment bonds rather than combination bonds, D & L was under no legal duty to object to such method.

■ Reformation is a remedy not easily won. Equity makes no favorite of a corporate surety. Contracts are construed most strictly against a compensated surety and in favor of indemnity. Home Indem. Co. v. F. H. Donovan Painting Co., 8 Cir., 325 F.2d 870, 874; American Cas. Co. v. Brezina, supra.

While such point is not here reached, we observe that relief if otherwise available might well be barred by National's negligence. See 76 C.J.S. Reformation of Instruments § 46. National should be held to be competent to apprehend the legal effect of bonds it is engaged in the business of writing and selling.

National has failed to meet the burden imposed upon it to establish its right to reformation of the bonds it is-

sued. The bonds by their clear and unambiguous terms provide a coverage for performance in the amount of $530,000 and a coverage for payment in like amount.

The judgment is reversed upon D & L's cross-appeal.

### III. NATIONAL'S APPEAL.

National upon its appeal raises the following issues:

A. The court erred in failing to discharge National from all liability under its bonds.

B. The court erred in the assessment of damages against National in various respects.

Such issues will be considered in the order stated.

### A.

■ National urges that D & L made payments on the Mojave subcontract which materially varied from the payment provisions of the subcontract. This issue is discussed in detail by the trial court at pp. 310 to 315 of 234 F. Supp. The court makes findings of fact which we find to be supported by substantial evidence, and upon the basis thereof determines that the provisions of the Miller and Capehart Acts should be read into the performance and payment bonds and that the prime contract is a part of the subcontract, and that when the subcontracts are so construed, the challenged payments made for materials inventoried but not actually incorporated in the work on the construction site were not in violation of the subcontract provisions and that D & L had no duty to the surety to insist upon receipts showing payment for the inventoried materials. Additionally, the court made a finding on conflicting evidence that National before executing the bonds had knowledge that such payments on inventory were customarily made on such projects and were in fact being made on this particular project, and that National had consented to such payments. We are in

full agreement with the trial court's treatment on this issue in its well-considered opinion and affirm its determination that National has not established that it is entitled to a discharge from its bond obligations in whole or in part on the ground of material departure upon the basis of the trial court's opinion.

### B.

National raises a number of troublesome problems under its assertion that the court erred in the assessment of damages. The trial court's treatment of the damage issues is covered by pp. 315–317 of 234 F.Supp. and by 238 F.Supp. 815. The principal errors urged will now be considered.

1. National asserts "that portion of the original subcontract price which was not paid by D & L to Mojave should have been credited against the completion costs claimed by D & L." The total agreed amount to be paid Mojave for the performance of its two subcontracts is $530,000. $143,621 of this amount has been paid Mojave, leaving a balance due on the subcontract of $386,379.

We agree with the trial court's view, supported by the authorities it cites, that the bonds here are not penal. They are designed to indemnify the prime contractor for any loss occasioned by failure of the subcontractor to fulfill his contractual obligation. The bonds contain no provision for the payment of a penalty or liquidated damage.

It is undisputed that Mojave defaulted on its subcontract and that timely notice of such default was given the surety, whereupon the surety refused to exercise its right to step in and complete the work. We do not in any way question D & L's right to complete the work and charge the cost thereof to Mojave and its surety. Much of the evidence with respect to completion costs is stipulated and there is no apparent basis for finding that the costs incurred in completing the work were not reasonable and necessary.

There is language in the subcontract which standing in isolation tends to support D & L's view that it can recover all costs incurred in completing the work. However, when the pertinent documents establishing the rights and liabilities of the parties are considered as a whole, it seems clear that the contract limits damage for nonperformance to the loss actually sustained by the default. Paragraph 16 of the subcontract dealing with the consequences of the subcontractor's defaults provides in part:

"If the unpaid balance of the contract price shall exceed the expense of finishing the work including but not limited to expense for additional managerial and administrative services Contractor shall pay to Subcontractor the amount by which said unpaid balance exceeds such expense; if, however, such expense exceeds said unpaid balance, Subcontractor shall promptly pay to Contractor the amount by which such expense exceeds unpaid balance."

Neither D & L nor the trial court has cited any authority supporting the view that the unpaid balance due on the subcontract should not be credited against the cost of completion. In a similar situation, the computation of damages approved by the Ninth Circuit in Dale Benz, Inc., Contractors v. American Cas. Co., 9 Cir., 303 F.2d 80, 86, clearly shows the unpaid portion of the subcontract price was deducted from completion costs.

72 C.J.S. Principal and Surety § 112 reads, "Where the obligee completes the work himself or has it completed by another, he may recover the amount actually and reasonably expended in completing the contract, in excess of the original contract price." To like effect, see 13 Am.Jur.2d, Building, etc. Contracts § 78 and cases cited in footnote 17 thereto.

The surety's rights and liabilities, absent a specific contrary agreement, are measured by those of its principal. D & L Constr. Co. v. Triangle Elec. Supply Co., 8 Cir., 332 F.2d 1009, 1013; 72 C.J.S. Principal and Surety § 92.

D & L was entitled to have the work subcontracted properly completed for $530,000. Here $386,379 of the agreed compensation for the work Mojave had agreed to do was never paid by reason of Mojave's default. If D & L recovers the full amount of its cost of completion of the subcontracted work, it would realize a windfall profit of $386,-379. This is because it would get the $530,000 of subcontracted work completed at a net cost of the $143,621 which it had paid to Mojave. We find no basis in the bond or the contract documents allowing such a windfall. D & L is entitled to compensation by way of damages to put it in the position it would have occupied if the subcontractor had faithfully fulfilled its contract but such is the limit of its rights.

The parties apparently agreed that the completion costs exceeded the $530,000 bond coverage awarded by the court. Such coverage was limited by the court's determination which we have rejected in Division II hereof. Upon remand, the court shall determine the full amount of allowable completion costs and deduct therefrom the unpaid amount of the subcontract price and allow the difference to the extent that such net figure falls within the bond coverage provided.

█ 2. National urges attorneys' fees should not be allowed to the extent that they are beyond the bond limits. The trial court awarded D & L $25,000 attorneys' fees. The court determined that the subcontract expressly provided for the allowance of attorneys' fees in the present situation and that hence attorneys' fees are recoverable on the bond under our holding in Triangle, supra. We agree. National does not dispute the foregoing nor does it attack the amount of fees allowed. National does urge that such fees are subject to bond limits and cannot be allowed here as other damages awarded exceed bond limits. Hartford Fire Ins. Co. v. Casey, 196 Mo.App. 291, 191 S.W. 1072, 1076, and other cases cited so hold. D & L concedes such is the law but urges that if coverage within bond limits is available, such fees should be allowed. By reason of other determinations made in this opinion, it appears likely that the attorneys' fees will fall within the limits of the bonds. The judgment entered allowing attorneys' fees is affirmed to the extent that the amount allowed does not exceed the bond coverage.

█ 3. National raises the issue that pre-judgment interest is not allowable and further urges that in any event such interest has been erroneously computed. The trial court discusses the pre-judgment interest issue at pp. 817–820 of 238 F.Supp. We agree with the trial court's view that the relevant documents contain no express provision for payment of interest and that hence it is necessary to look to state law to measure the subcontractor's obligation to pay such interest. We so held in Triangle. We also are in accord with the trial court's holding supported by the cases it cites that recovery for damages for breach of contract may include damage for delay in payment and that pre-judgment interest may be allowed beyond the bond coverage limits.

█ National's contention that pre-judgment interest was improperly computed must be upheld. Finding 14 indicates that the court computed interest on $530,000 at the rate of 6% per annum from April 4, 1960. Such was the date of D & L's letter to the bonding company notifying it of Mojave's default and demanding performance. We agree with National that this was a demand for performance, not a demand for money. No specific amount was demanded and no basis for computing damages existed on April 4, 1960. We are aware that the trial court makes a finding that the parties on April 4, 1960, could have reasonably determined the completion cost would exceed the bond coverage. We find no substantial evidence to support such a finding. The letter was written before the attempted subcontracts calling for some $20,000 in excess of Mojave's subcontracts. Apparently no

consideration is given to the credit required for the unexpended portion of the subcontract price. Moreover, neither the brief nor the record before us satisfactorily shows when in fact D & L paid the various items of completion cost but obviously most of these payments could not have been made until considerably after the April 1960 default by Mojave.

The pretrial order shows that D & L claims 6% interest on all allowable items of damage under the subcontracts, "said interest to accrue on each such item of damages from date of payment or from the date completion costs [exterior and interior] subcontract first exceeded the contract price—whichever is later." At the trial, the parties stipulated:

"Let the record show that counsel for D & L & Associates and counsel for National Union Fire Insurance stipulate and agree that interest calculated at the rate of six percent per annum, on the sum shown in the pre-trial order as the completion costs, would accrue from the date upon which the completion costs exceeded the contract amount until April 15, 1964; * * *"

The stipulation then goes on to set out agreed computations made on the foregoing basis. The amount allowed as interest exceeds the stipulated amounts. National in argument cites the stipulation. No explanation appears in D & L's brief on the court's opinion as to why the stipulation should not be adhered to. Parties are bound by stipulation of facts made unless such stipulations are properly withdrawn or set aside.

No contract provision for payment of interest has been called to our attention. Consequently, to the extent that the stipulation made is not binding, interest should be determined upon the basis of Missouri law. D & L Constr. Co. v. Triangle, supra; L & E Co. v. United States, 9 Cir., (Oct. 8, 1965) 351 F.2d 880.

The judgment entered for interest is set aside. Upon remand, interest shall be computed in a manner consistent with the views here expressed.

4. National contends that the court erred in not subtracting from the final judgment $43,359.10 which National paid toward the settlement of a General Electric claim for materials furnished under a stipulation that the rights of the parties hereto would remain the same as if the G.E. claim remained pending. D & L has not responded to this point. We are unable to ascertain from the record the precise items that are included in the judgment. If National was in fact charged in the judgment computation with the full amount of the G.E. claim, to the settlement of which it contributed, it would of course be entitled to credit for the amount it had previously paid upon such claim. If on the other hand National was not charged with the portion of the G.E. claim which it had previously paid, then the only relief National would be entitled to would be a reduction of its bond coverage to the extent of the payment previously made. Upon this issue, the case is remanded for further consideration and more specific finding.

5. Finally National urges that completion costs recoverable should be limited to the amounts by which the subcontracted work was relet to Carter and Modern exceeded the $530,000 called for by Mojave's subcontract. Such difference was slightly over $20,000. We agree with the trial court's rejection of such contention. While D & L did obtain new subcontracts, it was unable in the emergency to find responsible subcontractors who could give performance and payment bonds. The new subcontractors in turn defaulted. As pointed out by the trial court, all this difficulty arose out of Mojave's default and National's refusal to take over. We affirm the trial court's holding on this point.

## IV.

Because of the trial court's determination of certain issues before it, some issues raised, such as recovery for mana-

gerial and administrative expense, allocation of costs between the four bonds, the standing of D & L to sue on the payment bonds, and other issues that may have been material to the disposition of this case, were not disposed of. This opinion should be controlling on the trial court as to issues which we have expressly decided. We do not have a complete record before us and hence are not in a position to make a final disposition of this case. Moreover, it would appear that findings of the trial court on certain factual issues are required.

D & L asks for allowance of additional attorneys' fees in this appeal. The amount to be allowed is referred to the trial court for determination upon remand as well as the issue of the amount, if any, to be allowed for further legal services in the trial court.

Upon remand, a large discretion must be left with the trial court on the question of the extent, if any, that further evidence should be permitted or required with respect to unsolved issues remaining in this case.

On D & L's cross-appeal, the judgment is reversed. On National's appeal, we affirm the determination of the trial court that National has not been discharged from its bond obligations in toto or pro tanto.

We also affirm the court's rejection of National's contention discussed in III–B–5 of this opinion and on the allowance of attorneys' fees in III–B–2 subject to the bond limitation.

By reason of the errors pointed out in the computation of damages and the lack of sufficient findings to support other contentions with respect to damages as hereinabove pointed out, this case is remanded to the trial court for redetermination of the amount of damages due D & L on its performance and payment bonds, consistent with the views expressed in this opinion.